T.C. Memo. 1996-540


UNITED STATES TAX COURT


ERNESTO H. MONROY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4239-95.                    Filed December 16, 1996.


<u>Towner S. Leeper</u> and <u>John E. Leeper</u>, for petitioner.

<u>T. Richard Sealy III</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COHEN, <u>Chief Judge</u>:  Respondent determined deficiencies in, and penalties on, petitioner's Federal income taxes as follows:

| <u>Year</u> | <u>Deficiency</u> | <u>Sec. 6663(a)</u> |
|------|-----------|------------|
| 1990 | $416,765.00 | $312,573.75 |
| 1991 | $370,588.00 | $277,941.00 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether petitioner had unreported income in 1990 in the amount of $941,671; (2) whether petitioner had unreported income in 1991 in the amount of $563,877; and (3) whether petitioner is liable for the fraud penalty for 1990 and 1991.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time the petition was filed, petitioner resided in Leon, Mexico. Petitioner is a citizen of Mexico. Petitioner married Maria del Carmen Yurietta Valdes (Yurietta) in 1959; they had five children. Petitioner and Yurietta were separated in 1974, and Yurietta is not a party to this proceeding.

Petitioner filed Forms 1040, U.S. Individual Income Tax Returns, for 1988 through 1991. On those returns, petitioner stated that he resided in San Antonio, Texas. Petitioner claimed single as his filing status.

On December 27, 1989, petitioner applied for a mortgage on 4 Morning Downs, a residence located in the "Dominion", an exclusive country club in San Antonio, Texas. Petitioner purchased the home for $673,956, paying $5,302.65 as a down

payment. He named his employer on the mortgage application as TV Cable de Leon (Cable Leon) in Leon, Mexico. He listed his income, including salary and interest, as $30,000 per month.

Petitioner thought it would be a good idea to purchase lots in the Dominion, build homes on the lots, and sell the homes. On July 16, 1990, he purchased 31 unimproved residential lots in the Dominion for $1,147,000, paying $248,229.21 as a downpayment to Alamo Title Company (Alamo Title). In 1990, petitioner formed Interservice, Inc. (Interservice), a Texas corporation, to assist with his plans to build homes on the lots. Petitioner was the sole shareholder of Interservice. Petitioner and Interservice did not build homes on the lots. An Interservice ledger for the year ended October 31, 1991, shows a sale of four of the lots for $160,000.

In June 1990, petitioner and Gordon Sitton formed Monroy & Sitton (M&S). M&S purchased cable equipment and shipped it to petitioner's cable business in Mexico. For Federal income tax purposes, M&S filed as an S corporation, and the returns showed losses for 1990 and 1991. The losses were subsequently disallowed pursuant to an agreement among M&S, petitioner, and respondent.

Various documents named petitioner as the owner, president, and main stockholder of Cable Leon. He is also named as the owner of an administration company, a construction company, and a real estate company. Petitioner prepared a "Statement of

Financial Condition as of November 15, 1990." He listed the total value of his assets as $11,380,365. Included in his assets were his business interests as follows:

| Business Name | % Ownership | Market Value | Cost |
|---|---|---|---|
| TV Cable de Leon | 100% | $3,500,000 | $ 500,000 |
| Monne-building owner | 100% | 300,000 | 140,000 |
| Acoco-Cable Admin. | 100% | 210,000 | 120,000 |
| Celsa-Cable Constr. | 100% | 210,000 | 120,000 |
| Locator-Mexico | 100% | 500,000 | 500,000 |
| Iisa-Commercial Bldg. | 100% | 700,000 | 650,000 |
| | | $5,420,000 | $2,030,000 |

Petitioner listed his "Sources of Cash" as: salary (gross), $150,000; rental income, $888; dividend and interest income, $160,000; and dividends and distributions from business, $390,000. Petitioner's other assets included automobiles consisting of three Mercedes Benzs and one Jaguar with a total value of $215,000.

In November 1990, petitioner became interested in purchasing a controlling interest in an automobile dealership. As part of the negotiations, petitioner wrote a check for $50,000 to the owner of the dealership. The deal was never completed, and petitioner did not acquire an interest in the dealership.

Throughout 1990, petitioner received transfers of funds from Mexico that totaled $867,738. He deposited the funds in various accounts.

Petitioner became interested in purchasing a bank in San Antonio, Texas. Petitioner filed an application with the Texas Department of Banking to purchase the Bank of Leon Springs. The

application was signed by petitioner and notarized on July 3, 1991. Petitioner named Cable Leon as his employer, stating that he had been employed there since 1954 and that he was the main stockholder and president of the board. Information that petitioner provided on his individual financial statement included total assets of $14,831,800, a portion of which was represented by $7,500,000 in "notes and accounts receivable considered good and payable".

To substantiate to the Texas Department of Banking that petitioner had adequate assets with which to purchase the bank, petitioner had his family members, his five children and his wife, draw up promissory notes. The notes obligated each child to pay to petitioner $1,250,000 and his wife to pay to petitioner $1,875,000 over a period of 15 years. Petitioner's accountant, Dan Boldt (Boldt), prepared a document titled "Ernesto H. Monroy M., Personal Financial Statement as of February 28, 1991". The financial statement listed the same business interests as were listed in the 1990 financial statement, except that the total market value of the business interests was increased to $7.5 million. The financial statement represented that petitioner was holding the stock of certain corporations, valued at $7.5 million, as collateral for the promissory notes; that each child owned a 15-percent interest in the stock; and that his wife owned a 25-percent interest in the stock. After receiving the application to purchase the bank, the Texas Department of

Banking requested substantiation on the promissory notes. Petitioner was notified that he would have to submit his fingerprints as part of a routine background check by the Federal Bureau of Investigation. Petitioner did not respond to the requests and did not purchase the bank. Petitioner subsequently returned the promissory notes to his family members.

Petitioner entered into an option agreement to purchase a shopping center in San Antonio for $1,880,000. Correspondence dated July 19, 1991, provided petitioner's financial information to a mortgage company in connection with the purchase of the shopping center. The information that petitioner provided included salary of $150,000 as acting adviser for Cable Leon and the other companies in Mexico and dividends and interest of $1,013,149 from income on notes due him from his children. Petitioner paid $10,000 for the option but subsequently did not exercise his right to purchase the property.

In August 1990, petitioner hired Lorena Esquivel (Esquivel) to work for M&S. After M&S was dissolved in 1991, Esquivel continued to work for petitioner as an employee of Interservice. Esquivel acted as a personal assistant to petitioner and was very involved in his business and personal affairs. Her duties included assisting petitioner with correspondence and filling out applications. In May 1991, Esquivel and Boldt interviewed and hired Gloria Rodriguez (G. Rodriguez) as a bookkeeper. G. Rodriguez's tasks included setting up vendor and

administrative files and creating backup for bank statements, accounts receivable, and notes payable.  She worked on petitioner's personal accounts and business accounts, including M&S and Interservice.  G. Rodriguez gathered information for use by Boldt, who prepared petitioner's 1990 Federal income tax return.

As part of G. Rodriguez's duties, she prepared various ledger sheets reflecting transfers of funds into and out of petitioner's business and personal accounts.  On numerous occasions, G. Rodriguez inquired as to the source of the funds in an attempt to perform her duties and to reconcile the accounts. She was instructed by petitioner to label many of the transfers as payments from or amounts payable to either "Mexican Company" or petitioner's wife.  She was never told the name of the Mexican company or the reason that a Mexican company would be transferring funds to petitioner.  She was not aware of any loans from petitioner's wife.  Other financial reports that were prepared by G. Rodriguez for petitioner listed the source of the funds as "??" because petitioner would not provide her with the source of the deposits.

Petitioner left for Mexico in the beginning of July 1991 because his mother was terminally ill.  During that same time, G. Rodriguez was contacted by U.S. Government authorities, specifically U.S. Customs and the Internal Revenue Service (IRS), regarding the activities of petitioner.  The Government was

investigating, at least in part, the source of petitioner's income.  G. Rodriguez notified Esquivel about the investigation.

Petitioner did not return to live in the United States after his mother's death.  He had been informed that he was the subject of an investigation by the U.S. Government.  In August 1991, petitioner summoned G. Rodriguez and Esquivel to Mexico to meet with him.  In Mexico, petitioner, petitioner's daughter Gabriela, and Esquivel reviewed petitioner's bank accounts and discussed wire transfers and money orders.  A comparison was made between the records that Esquivel kept in the United States and the records that Gabriela kept in Mexico.

Sometime during the summer of 1991, petitioner replaced Boldt with a new accountant, William C. Bradley (Bradley).  Esquivel sent a letter to Bradley dated October 22, 1991.  The letter accompanied a "summary and copies of deposits received in our office from Mexico to the best of my knowledge."  The summary amounts for Interservice showed deposits from January 1, 1991, through July 18, 1991.  The 1991 transfers to Interservice from Mexico totaled $545,423.20.  Included in that amount was a $6,000 deposit from Cable Leon.  In addition to the $545,423.20 deposits from Mexico, there were also two July 29, 1991, deposits to Interservice totaling $3,500.  The source of the $3,500 deposits was "Gabriela Monroy", petitioner's daughter.  The 1991 Interservice deposits from Mexico and Gabriela totaled $548,923.20.

In December 1991, Esquivel typed a check payable to petitioner's wife for $48,923.20. The notation on the check was "Loans $548,923.20, 1st payment $48,923.20" with a balance showing of $500,000.

Bradley sent to petitioner a letter dated March 11, 1992. The letter was in response to a request from petitioner. The letter addressed the accounting and tax status of petitioner and his business entities. In relation to Interservice, Bradley stated:

> The Federal Income Tax Return for this Company is due July 15, 1992. It was put on extension to that date because I do not have the information necessary to prepare the tax return. Enclosed are copies of letters dated January 16 and February 20, 1992. I have yet to receive any information from these requests. From discussions I have had with Ms. Gloria Rodriguez, your bookkeeper, it is my understanding that there are no general ledger, cash receipts or disbursements journals on this Company and that there is no sharing of accounting information between Gloria and Lorena in order to produce this accounting data needed for the tax return.
>
> Someone is going to have to do the bookkeeping on this Company for the year ended October 31, 1991 and produce a balance sheet and income statement for the year with bank accounts reconciled and capital accounts tied to the prior year end closing. Gloria is the logical person to do this, but Lorena is going to have to work with her and get her accounting data other than bank statements and canceled checks.

In relation to petitioner's personal account, Bradley stated:

> Your tax return is due April 15, 1992. We can, if necessary obtain an extension of time to August 15, 1992 to file the return if we need the additional time. We will need a copy of your Mexico tax return for 1991, interest income you received and all interest expense paid listed by recipient and purpose of borrowing. I

will also need the cost and selling price of any assets you disposed of in 1991. I am equally concerned that your not having a personal set of books will only add to confusion in the future. I am aware of a number of asset disposals you have made so far this year. These items are business transactions that will need to be reported for tax purposes but I am concerned that, without a set of books, it will be much more difficult to prepare an accurate tax return next year with a minimal amount of time and effort.

Esquivel and G. Rodriguez compiled a list of all of the items in petitioner's home. The list included a description of the items, the quantity of items, and the value of the items. On July 31, 1992, petitioner filed with the clerk of Bexar County in San Antonio, Texas, a Uniform Commercial Code (UCC) financing statement. Attached to the financing statement was the list of petitioner's household items, a security agreement between petitioner and his wife, and a note between petitioner and his wife. The security agreement granted petitioner's wife a security interest in petitioner's household items. The security interest was granted in exchange for petitioner's obligation to pay his wife $214,149.76, purportedly represented by the note.

Petitioner's 1990 Federal income tax return was prepared by Boldt. The return showed no wage income, interest income of $21,597, adjusted gross income of $3,722, itemized deductions of $87,485, and zero tax owing. Petitioner subsequently amended his 1990 return to add Mexican wages of $6,398 and a Mexican tax refund of $497. The total tax due after the amendment remained zero. Petitioner's 1991 Federal tax return was prepared by

Bradley. The return showed no wage income, interest income of $48,721, adjusted gross income of $79,518, itemized deductions of $162,312, and zero tax owing.

The IRS began the audit of petitioner's 1990 and 1991 Federal income tax returns in 1992. Petitioner's responses to the auditing revenue agent's information requests were inadequate. The revenue agent was informed by Esquivel that petitioner was working in Mexico and had sold some companies in Mexico. Esquivel subsequently informed the agent that she had been advised by Bradley and Nina Henderson (Henderson), petitioner's attorney, not to provide any information to the IRS. During the audit, the revenue agent was informed by petitioner or petitioner's representative that the source of petitioner's income was loans from Mexico. That explanation was contradicted by Boldt, who informed the agent that there were no loans from Mexico. In 1994, Bradley provided the agent with documents that were represented to substantiate the loans. The documents were in Spanish and consisted of a ledger sheet from a Mexican company that listed loans to petitioner from December 1989 through December 1990 of approximately 3,085,342,000 pesos; a promissory note from petitioner to the Mexican company for 3,085,342,000 pesos dated December 1, 1990; and two invoices for interest due to the Mexican company on the promissory notes. The invoices were dated December 1990 and January 1992, numbered 008 and 017,

respectively, and both invoices listed petitioner's address as Ave. Hidalgo, #407 in Toluca, Mexico.

Respondent determined the deficiencies in petitioner's Federal income tax by using the source and application of funds method.

## OPINION

Respondent argues that the 1990 and 1991 transfers from Mexico and the 1990 downpayment to Alamo Title were unreported taxable income to petitioner from petitioner's business interests in Mexico. Respondent also argues that petitioner underpaid his taxes for both years due to fraud. Petitioner contends that the transfers and downpayment were nontaxable loans from a Mexican corporation and his family.

The penalty in the case of fraud is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of an underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b). If respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subjected to a 75-percent penalty

unless the taxpayer establishes that some part of the underpayment is not attributable to fraud.  Sec. 6663(b). Respondent's burden is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud will never be presumed.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).  Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available.  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). A pattern of consistent underreporting of income for a number of years, when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud as to each of the years.  Holland v. United States, 348 U.S. 121, 137 (1954); Otsuki v. Commissioner, supra.

Under section 61, gross income includes "all income from whatever source derived."  Where a taxpayer keeps no books and records, or the taxpayer fails to file a return from which his

income tax liability can be assessed, respondent may reconstruct the taxpayer's income by using any method that, in the opinion of respondent, clearly reflects income. Sec. 446(b); Moore v. Commissioner, 722 F.2d 193 (5th Cir. 1984), affg. T.C. Memo. 1983-20. The source and application of funds method of determining a taxpayer's gross income is well accepted. United States v. Johnson, 319 U.S. 503, 517 (1943); Meier v. Commissioner, 91 T.C. 273, 295-296 (1988). In this case, the evidence of unreported income originated from respondent's source and application analysis.

The parties stipulated to a source and application of funds analysis that "correctly reflects petitioner's understatement of gross income for the taxable year 1990, except that petitioner contends that loans in the amount of $867,738.00 from a Mexican corporation should be included as a source of funds, and that the source of the $248,229.00 Alamo Title item was a loan from Mexico". The parties also stipulated to a source and application of funds analysis that "correctly reflects petitioner's gross income for the taxable year 1991," except that petitioner contends that loans made to Interservice Corporation should not be included as an application of funds. For 1990, the stipulated analysis includes an "understatement before disputed item" in the amount of $941,671 and an "understatement after disputed items" as ($174,296). For 1991, the "understatement after disputed item" is shown as $25,454. Petitioner has thus stipulated that

there was an understatement for 1991, and the existence of an understatement for 1990 depends on whether the two identified items were income, as respondent contends, or loans, as petitioner contends. As a result of the stipulation, the validity of respondent's indirect method of reconstructing petitioner's taxable income is not genuinely in dispute.

Petitioner asserts that respondent has not satisfied her burden of proof because she did not investigate all of the possible nontaxable sources of funds, specifically the alleged loans from Mexico. We agree that respondent may not disregard explanations of petitioner that are reasonably susceptible of being checked. "But where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant." Holland v. United States, supra at 138.

Petitioner was not forthcoming with relevant leads. Petitioner did not offer to respondent the explanation that the understated income was attributable to loans until well into the audit. Once petitioner claimed that the source of the income was loans, petitioner gave respondent inconsistent explanations of the source of the loans. Petitioner alternated between asserting that the loans were from Mexican companies or from his wife, from whom he has been separated for 20 years. Petitioner, through Bradley, did not provide any substantiation to support the loans until approximately 2 years after the audit began. The timing of

the information and the claim that the loans were from Mexico made it difficult to investigate.

Respondent substantiates her assertion of unreported income with information on deposit slips and with petitioner's statements that he was the owner of and had income from Cable Leon on numerous documents, including the mortgage application for the home in the Dominion, the Statement of Financial Condition that petitioner prepared, the application to the Texas Department of Banking, and the information provided in connection with the attempted purchase of the shopping center. Petitioner represented on various documents that he was the sole owner of several other businesses and that he had substantial income from Cable Leon.

Respondent's agent examined petitioner's bank accounts, deposit slips, and the financial reports prepared by G. Rodriguez. The source of the funds on the documents was often left blank. At least one deposit slip showed the source of the funds was Cable Leon. Respondent interviewed Boldt and G. Rodriguez. Neither of them was aware of any loans from Mexican companies or petitioner's wife.

Petitioner admits that the Mexican businesses exist. It is his assertion, however, that the stock in the businesses is not in his name. Petitioner testified that he is a playboy and that his father did not trust him with the family fortune. He asserts that his father put his share of the family assets into a Mexican

corporation, Grupo Empresarial Monyurri (Grupo), and gave petitioner's wife and children the stock of Grupo. He testified that he is not good with numbers but, when he had an idea for a business, he would pitch it to his family and they would give him the money in the form of a loan. Petitioner previously asserted that the loans were from a Mexican company, although he did not provide an explanation as to why a Mexican company would loan money to petitioner or to Interservice.

Petitioner asserts that it is "totally believable and consistent that petitioner was able to borrow $1,115,967 from his family and his family's corporation", because banks were willing to lend money to petitioner. Petitioner cites various loans, including the loans on the house and lots in the Dominion, to corroborate this assertion.

The bank loans that petitioner received were based on information provided on loan applications. Petitioner stated on the loan application for the house in the Dominion that his gross monthly income was $30,000. According to petitioner's testimony, however, his family was aware that he did not have income. It is not credible that loans in the amounts claimed would be made to someone with no income from which to repay the loans.

Petitioner also argues that two sets of documents substantiate his claim of loans in 1990, the UCC financing statement and the ledger sheet, with promissory notes in Spanish, given to respondent in 1994 during the audit. G. Rodriguez

testified that petitioner obtained the UCC financing statement to protect his personal items from levy for unpaid taxes. Her testimony is consistent with the sequence of events established by the evidence.

The ledger sheet and promissory notes that were given to respondent in 1994 are unreliable. G. Rodriguez and the revenue agent both testified that they had been informed that there were no loans from petitioner's family. The documents were not provided to the IRS until 1994, 2 years after the agent requested the information. Additionally, the address on the December 1990 invoice was listed as Ave. Hidalgo, #407 in Toluca, Mexico. Petitioner was residing in San Antonio at the Dominion in 1990. The address on the invoice was the address that petitioner used after returning to Mexico in 1991.

Petitioner also argues that the 200,000,000 pesos deposited in his account at Banca Cremi was a loan and that petitioner planned to use the proceeds of that loan to pay back the family loans. The only document in evidence on this point is a deposit slip in Spanish for 200,000,000 pesos deposited into a bank account. There are no loan documents or any indication that the deposit was a loan or that the proceeds were going to be used in any particular manner. Further, using petitioner's exchange rate of 2,889 pesos per dollar, the 200,000,000 pesos would convert to approximately $69,228, an amount insignificant in comparison to the total amount that petitioner claims to owe his family.

Petitioner argues that the deposits to Interservice in 1991 could not have come from him because the amounts were not recorded as loans from shareholders on the books. On brief, petitioner's position is that the amounts in issue are loans from his wife. Petitioner supports this assertion by pointing to a check from petitioner to his wife, which is purportedly a payment on the loans owed to his wife.

Both G. Rodriguez and Esquivel testified that they traveled to Mexico to meet with petitioner and his daughter. G. Rodriguez testified that the reason for the meeting was to "create backup" for the transfers of money to petitioner and Interservice so that it appeared that the money was not income to petitioner. Esquivel testified that the purpose of the trip was to compare numbers. G. Rodriguez testified that, while she and Esquivel were in Mexico, petitioner gave instructions to record the amounts as transfers from a "Mexican Company". Approximately 2 months after the trip to Mexico, Esquivel sent to Bradley a letter listing the deposits to Interservice from Mexico. Esquivel did not indicate in the letter to Bradley that the deposits were loans. On an Interservice ledger sheet, the amounts were listed as payable to a "Mexican Company" and Gabriela Monroy. One of the deposits was listed as from Cable Leon.

The evidence supports respondent's assertion that the deposits to Interservice were not loans but income to petitioner

that petitioner had caused to be deposited in Interservice's account. The Interservice check to petitioner's wife as a purported loan payment, standing alone, is insufficient without supporting documentation or a credible explanation as to why petitioner's wife would make loans in excess of half a million dollars to Interservice, particularly when Interservice did not build any homes. Petitioner has failed to give a credible explanation of why deposits that are purportedly loans from his wife would have come from Cable Leon or his daughter. Esquivel's testimony that she traveled to Mexico just to compare numbers is not credible.

The evidence is clear and convincing that the stipulated amounts received by petitioner and amounts petitioner received as deposits to Interservice constituted income and not loans. Thus, respondent has proven an understatement of income. Even in criminal cases, where the Government bears the burden of proof beyond a reasonable doubt, proof of unreported income is sufficient to establish an underpayment of tax absent proof by the taxpayer of offsetting expenses. See, e.g., United States v. Hiett, 581 F.2d 1199, 1202 (5th Cir. 1978); Elwert v. United States, 231 F.2d 928, 933-936 (9th Cir. 1956); United States v. Bender, 218 F.2d 869, 871 (7th Cir. 1955). A fortiori, that proof is sufficient in this civil case.

Respondent has established a likely source of income, petitioner's business interests in Mexico. Respondent

investigated the leads that were forthcoming and reasonably susceptible of being checked. Respondent has satisfied the standards set forth in Holland v. United States, 348 U.S. 121 (1954). Moreover, respondent's evidence that petitioner had unreported income is clear and convincing, whereas petitioner's claim that the funds stipulated as having been received by him were loans is simply not credible. Respondent has proven by clear and convincing evidence an understatement.

Respondent, of course, must also prove fraudulent intent. Fraudulent intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including an understatement of income, inadequate records, implausible or inconsistent explanations of behavior, and failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. A willingness to defraud another in a business transaction may point to a willingness to defraud the Government. Solomon v. Commissioner, 732 F.2d 1459, 1462 (6th Cir. 1984), affg. T.C. Memo. 1982-603.

The facts in this case include many "badges of fraud". Petitioner kept inadequate books and records for his personal accounts and Interservice. Petitioner gave inconsistent explanations for the sources of income, alternating between loans from his wife and loans from Mexican companies. Petitioner failed to cooperate with the IRS, providing no explanation for the unreported income for almost 2 years and then failing to

provide credible substantiation.  Petitioner denied that he had instructed anyone to fabricate loan documents, but he testified that the promissory notes for $7.5 million were created and delivered to the Texas Department of Banking as part of his plan to acquire the bank and that his family did not owe him money at that time.

Additionally, Esquivel testified that she never submitted false information about petitioner's finances to anyone or any entity.  She admitted to sending information relating to petitioner's purchase of the shopping center that stated that petitioner's income was $150,000 annually.  She then testified that petitioner had no income.  Petitioner's and Esquivel's testimony are inconsistent, improbable, and unworthy of belief.

Respondent has proven by clear and convincing evidence an underpayment of tax due to fraud for each year.  Petitioner has not proven that any part of the underpayment is not attributable to fraud.  See sec. 6663(b).

<u>Decision will be entered</u>

<u>for respondent</u>.